CRENSHAW *et al. v.* PEARCE.

*(Circuit Court, S. D. New York. September 29, 1890.)*

SHIPPING—MISTAKE IN BILL OF LADING—AGENTS' OPTION—LIABILITY OF SHIP-OWNER.

U., the common agent of several different steam-ships, owned by different owners, and running independently on stated days, forming the "Guion Line," agreed with libelants to transport 800 bales of cotton per steamer A. $^{\text{and}}_{\text{or}}$ W., agent's option. A part were sent by the A., the rest by the W., a week later. U. only had authority to determine by which vessel goods should go. Without his knowledge or consent, shipping receipts were delivered to libelants, through some mistake of the subemployes, apparently induced in part by the libelants' ships. The receipts stated that the goods were to go by the A. only; upon the faith of which, without U.'s knowledge, bills of lading were issued at his office, for all the cotton per steamer A. The cotton shipped by the W. arrived about 10 days later than that by the A., and, the price falling in the mean time, the libelants sued the owner of the A. for the loss. *Held*, that there was no liability on the part of the owner to libelants, except for the amount of insurance paid by the latter on cotton on the A., which was not carried by that vessel.

In Admiralty. On appeal from district court. See 37 Fed. Rep. 432.

*Evarts, Choate & Beaman,* for libelants.

*Wilcox, Adams & Macklin,* for respondent.

LACOMBE, Circuit Judge.

### FINDINGS OF FACT.

*First.* During the months of August and September, 1887, the libelants were, and have since continued to be, partners in business in the city of New York, doing business under the firm name of Crenshaw & Wisner.

*Second.* During such times the respondent was, and is now, the owner of the steam-ship Arizona.

*Third.* In said months of August and September, 1887, the said steam-ship Arizona, and the steam-ship Wisconsin, with other steam-ships, constituted what is known as the "Guion Line," sailing weekly from New York to Liverpool, the pier at which the steam-ships belonging to the said line lay in New York being known as the "Guion Line Pier."

*Fourth.* During said period, the steam-ship Wisconsin was owned by the Liverpool & Great Western Steam-Ship Company, and was one of the steam-ships of the said Guion Line, the name "Guion Line" being a trade name or designation to sail under, the vessels of the line being owned by different persons. Separate and distinct accounts were kept for each vessel; and the owners of one vessel were not interested in the business of the other vessels. During all of the said period, the firm of A. M. Underhill & Co. were the agents of the owners of all the steamers running in the Guion Line, including the Arizona and Wisconsin.

*Fifth.* On or about the 24th and 26th days of August, 1887, libelants made two contracts with said Underhill & Co. as such agents for the carriage, respectively, of 500 and 300 bales of cotton from New York to Liverpool. The contracts were negotiated through Carey, Yale & Lambert, freight brokers in the city of New York, acting as libelants' brokers in engaging the freight, and as the brokers of Underhill & Co. in letting the freight. The contracts read as follows:

"NEW YORK, August 26th, 1887.

"Engaged for acct. of Crenshaw & Wisner, on board steam-ship of 'Guion Line' expected sailing 6th $\substack{and \\ or}$ 13th September (agents' option) for Liverpool, A. M. Underhill & Co., Agents, abt. 300 bales cotton, at 5/32d and 5 per cent. primage per lb. for comp'd, and 7/32d and 5% primage per lb. for uncomp'd. This contract is made subject to the terms and conditions of the form of bill of lading approved by the New York Produce Exchange for this line.

"CAREY, YALE & LAMBERT, Brokers,
"Per FRED. O. HOLMES.

"NEW YORK, Aug. 24th, 1887.

"Engaged for acct. of Crenshaw & Wisner on board steam-ship of "Guion Line" 6th $\substack{and \\ or}$ 13th Sept. (agents' option) for Liverpool, A. M. Underhill & Co., Agents, 500 bales cotton at 5/32d and 5% primage per lb. for comp'd and 732d and 5% primage for uncomp'd. This contract is made subject to the terms and conditions of the form of bill of lading approved by the New York Produce Exchange for this line.

"CAREY, YALE & LAMBERT, Brokers,
"Per FRED. O. HOLMES."

*Sixth.* During August, 1887, the said A. M. Underhill & Co. had advertised that the said steam-ship Arizona would sail from New York bound for Liverpool on the 6th of September, and the steam-ship Wisconsin upon the 13th of September.

*Seventh.* Freight contracts in the form of those set out in the fi._._a finding, giving the agents the right to select either or both of two steamers, are common in the shipping business. The option reserved is a valuable one for the agents, since it enables them to load their vessels with perishable cargo, such as food and fruit, which is delivered at the pier shortly before the vessels sail, and for which a high rate of freight is

charged; and then, if any space remains, it is filled up with such merchandise as cotton, which is.carried at a lower rate of freight. The custom benefits the shipper of the cotton, because, by reserving to themselves the option of selecting the steamer, the vessels' agents are able to reduce the rates of freight therefor. The exclusive charge of allotting cargo received by A. M. Underhill & Co. to be shipped by the vessels of the Guion Line was, at the time, with Harvey I. Underhill, one of said firm.

*Eighth.* On or about August 26, 1887, the libelants received in due course of business from the said A. M. Underhill & Co., as agents of the steamers running in the said Guion Line, a paper called, in the export cotton trade, "a permit," reading as follows:

"NEW YORK, Aug. 25th, 1887.

"S. S. ARIZONA $^{and}_{or}$ WISCONSIN.

"Pier, Guion Pier.

"Received from Crenshaw & Wisner abt. 800 bales cotton; uncomp'd to Empire press. To be delivered on and after Aug. 30th.

"All risk of fire or flood while goods are on the dock to be borne by shippers.

"A. M. UNDERHILL & Co., Agents.

"F. O. H."

*Ninth.* Pursuant to such contracts and permit the libelants on August 30, August 31, September 1, and September 2, 1887, sent by their truckmen 629 bales of cotton to the Guion pier, where the said steam-ship Arizona then lay bound for Liverpool, and 219 bales of cotton uncompressed to the Empire press. At the time of such delivery the Wisconsin had not arrived at the port of New York.

*Tenth.* As each load was delivered, the truckman presented a "ticket" specifying the number of bales which he delivered. The person receiving the load at the press, or at the pier, as the case might be, counted the bales, and, if the number was found to be correct, initialed and returned the ticket. When each truckman had delivered the entire quantity which he was to carry, he received a "general receipt" embracing all the lots which he had delivered. Such shipping receipts were delivered to libelants, and specified the number of bales received for shipment. This was all in accordance with the course of business pursued by A. M. Underhill & Co.

*Eleventh.* There were in all seven of these receipts given to libelants. Three were for the 219 bales delivered to the press, were signed by the agent of the press, and were substantially in the following form:

"Received from Empire cotton-press in good order from Crenshaw & Wisner, for steam-ship Arizona, * * * bales of cotton, marked as per margin.

"Per Empire cotton-press. [Signature.]"

Four of said seven receipts were for the 629 bales delivered at the pier, and were substantially in the following form:

"GUION LINE PIER, Aug. 31, 1887.

"WILLIAMS & GUION, No. 29 Broadway.

"Received for steam-ship Arizona on account of Crenshaw & Wisner, subject to terms and conditions of company's bills lading, for which it is agreed

this receipt shall be exchanged on or before date of sailing, * * * bales cotton."

—And were signed by the receiving clerk of said Guion Steam-Ship Company, or his assistant.

*Twelfth.* It was the custom of the said A. M. Underhill & Co., as agents for all the steam-ships in the Guion Line, including the Arizona, to consider a delivery by the shipper to the Empire press a delivery to the steam-ship.

*Thirteenth.* By said A. M. Underhill & Co.'s course of business, when the contract made with a shipper provided for an option as to the steamer by which goods were to be carried, it was required that the shipping receipts given at the dock, or at the press, should be in the same form as the permit, and should specify both steamers, and no employe of Underhill & Co. had any authority to depart from such rule without express instructions from Mr. Underhill. The omission of the option from the seven receipts described in the eleventh finding was without authority from Harvey T. Underhill or from A. M. Underhill & Co., and without his or their knowledge, and arose from a mistake on the part of their employes at the pier, and of the agent of the Empire press. This mistake was caused partly by the form of the tickets brought by the truck-men when they delivered their loads. These tickets were prepared by the libelants and in many cases specified the Arizona as the vessel by which the cotton was to be carried, instead of expressing the option which the contracts and permit provided for. In preparing the general receipts, the tickets were followed by the shipping clerk at the pier and the agent of the press, who assumed that such tickets were correctly drawn, the Arizona being the next steamer of the Guion Line advertised to sail.

*Fourteenth.* Pursuant to the usual course of business the said receipts were presented at the office of A. M. Underhill & Co., by libelants, and in exchange for them the three bills of lading annexed to the libel herein were given. In preparing the bills of lading, the clerks employed by Underhill & Co. followed the shipping receipts, and specified the Arizona as the vessel by which said cotton was to be carried.

*Fifteenth.* The steam-ship Arizona sailed from the port of New York on the 6th day of September, and arrived in Liverpool about September 14th, carrying all the 219 bales of cotton which were delivered at the Empire press, as aforesaid, and 70 of those delivered at the pier as aforesaid, and the rest of the said cotton, namely, 559 bales, were transported to Liverpool by the steam-ship Wisconsin, which left New York on September 13th, and arrived in Liverpool on the 24th day of September, 1887.

*Sixteenth.* The respondent kept in his possession the said shipping receipts so given as aforesaid by him, but failed to notify the libelants that any of the cotton was not shipped in the Arizona, and the first knowledge that the libelants had that all the cotton was not carried in the Arizona was acquired on or about October 2, 1887.

*Seventeenth.* On August 27, 1887, the libelants applied to the sub-

scribers at United States Lloyds for insurance under their open policy with said subscribers in the sum of $46,000 on about 900 bales of cotton, valued at sum insured on board the steam-ship Arizona, $^{\text{and}}_{\text{or}}$ other steamer same line at and from New York to Liverpool. This application was accepted by such insurers. Subsequently, being misled by the designation of the Arizona in the bills of lading, the libelants notified the underwriters that all cotton except 185 bales was going by the Arizona. Thereupon such application was changed to read only "Arizona," and certificates of insurance were issued in accordance with such notification, and the libelants attached drafts to the said certificate and bills of lading, and sold such drafts to bankers in the city of New York. Libelants paid the premium upon said risk.

*Eighteenth.* Otherwise than as specified in the seventeenth finding, the libelants did not do anything, or refrain from doing anything, which they would have done, or refrained from doing, had they not been misled as to identity of the vessel which in fact carried the 559 bales.

*Nineteenth.* The price of cotton of the class in question fell in Liverpool between the date of the arrival of the Arizona and the date of the arrival of the Wisconsin three-eighths of a penny per pound.

*Twentieth.* The allotment of said shipment, namely, 219 bales to the Arizona and 559 bales to the Wisconsin, was made by Harvey T. Underhill.

#### CONCLUSIONS OF LAW.

*First.* The libelants are entitled to recover from the respondent the amount of the premium of insurance which the libelants paid for insurance on cotton on the Arizona, which was not carried by that vessel.

*Second.* There is no other liability on the part of the respondent to the libelants.

*Third.* The decree of the district court should be reversed, with costs of this court only, and an order of reference made to a commissioner for the purpose of ascertaining the said damages of the libelants.